**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| JENNIFER B., individually and as mother and next friend of S.B., a minor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 2:11-cv-839-MEF [WO – Publish] |
| CHILTON COUNTY BOARD OF EDUCATION, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Jennifer B. ("Ms. B."), a high school English teacher, filed a complaint in this Court on behalf of herself and her disabled child, S.B., against her employer, Chilton County Board of Education ("the Board"). Ms. B. alleges that the Board denied equal educational opportunities to S.B., denied her equal employment benefits on the basis of S.B.'s disability, and retaliated against her for advocating for her son's rights. Ms. B. seeks declaratory relief, reimbursement for S.B.'s placement in another preschool program, compensatory damages, and attorneys' fees under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.

1

The parties filed cross motions for summary judgment.  The Board seeks summary judgment on all of Ms. B.'s claims.  More specifically, the Board has requested that the Court either (1) dismiss Ms. B.'s claims on the ground that she has failed to exhaust her Section 504 and ADA administrative remedies to the extent required by the Individuals with Disabilities Education Act ("the IDEA"), 20 U.S.C. § 1415, or (2) stay the present action to allow Ms. B. to exhaust her administrative remedies. (Def.'s Summ. Judg. Br. 39 (Doc. # 21).)  Ms. B. seeks partial summary judgment on her claims for declaratory relief and reimbursement for her childcare costs.  (Pl.'s Corrected Partial Summ. Judg. Br. 3 (Doc. # 29).)

Because the Court concludes that the Ms. B.'s requests for relief have not been sufficiently exhausted under the IDEA, the Court orders that this action be STAYED and REMANDED to the Alabama Department of Education for resolution of the IDEA-based issues and claims pervading this dispute.  Accordingly, the Court DENIES both parties' motions for summary judgment with leave to refile after administrative review has been completed.  This opinion will address only the issue of exhaustion under the IDEA.

## II. JURISDICTION AND VENUE

This Court has federal question jurisdiction over Ms. B.'s claims under 28 U.S.C. § 1331. The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

### III. LEGAL STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To shoulder this burden, the moving party can present evidence to this effect.  *Id.* at 322–23.  Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof.  *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995).  A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed,

a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

In resolving the parties' cross motions for summary judgment, the Court construes the facts in the light most favorable to the non-movant when the parties' factual statements conflict or inferences are required. *Barnes v. Sw. Forest Indus.*, 814 F.2d 607, 609 (11th Cir. 1987).

## IV. FACTUAL AND PROCEDURAL BACKGROUND

### A.  Relevant Facts

#### 1. The Parties

S.B. is a five-year-old boy who suffers from pachygyria, a neuronal migration disorder that negatively affects his motor and communication skills and causes moderate developmental delays. (Pl.'s Ex. 3, Doc. # 24-3, at 3.) His physical mobility has also been restricted since he underwent corrective surgery for his two "club feet." (*Id.*) S.B.'s

disability entitles him to a "free and appropriate education" ("FAPE") under the IDEA, a federal statute that regulates the provision of public education to children with disabilities by state and local school systems receiving federal funding.  20 U.S.C. § 1412.  He is also entitled to have an Individualized Education Program ("IEP") developed for him by a team made up of his parents, teachers, and school administrators that outlines his educational goals.  20 U.S.C. § 1412(a)(4).  His mother, Jennifer B., is a high school English teacher employed by the Board.  (Jennifer B. Dep. 18–16 (Doc. # 20-3).)  The Board is a local education agency that receives federal financial assistance (Pl.'s Request for Admissions (Doc. # 24-6).)

### 2. *The PALS Preschool Program*

The Board operates a preschool program called Preschoolers Acquiring Learning Strategies ("PALS"),  (PALS Description 1 (Attach. to Levey Aff.) (Doc. # 20-4)), which S.B. attended in the 2009–2010 and 2010–2011 school years.  One of the primary purposes of PALS was to provide "typically developing" children and "special needs" children with an "inclusive learning environment," allowing special needs children to "benefit from observing and interacting with same-age typically developing peers who demonstrate appropriate behaviors and learning strategies."  (*Id.*)

The program description and rosters indicate that each PALS class was made up of approximately seven typically developing children and seven special needs children, a 50-50 ratio.  (*Id.*; PALS Rosters 1–4 (Attach. to Second Levey Aff.) (Doc. # 33-1).)  Typically developing children went through an application and ranking process to obtain one of the

seven full-day spots available in PALS (Levey Aff., at ¶ 7) and paid a tuition fee of $200 per month to attend.  (PALS Description 4–5 (Doc. # 20-4); PALS Rosters, at 1–5 (Attach. to Second Levey Aff.).)  Children and grandchildren of Board employees who met the criteria of a typically developing peer were given the first available full-time spots in the program PALS Description, at 2.)  This preference was given so that teachers and staff could have a convenient placement for their children during the school hours.  (Cahalane Dep. 74–76 (Doc. # 20-2).)

Special needs children, on the other hand, attended free of charge (PALS Description, at 4–5) but were required to go through the special education referral process to be determined eligible for special education services. (*Id.* at 3–4.)  The amount of time special needs children spend in the program was determined by their IEP teams and depended on the child's particular needs. (*Id.* at 5).

In the school years that S.B. attended PALS, the preschool operated from 7:30 a.m. to 2:40 p.m.[1]  (*Id.* at 1.)   A research-based learning curriculum called "We Can" was provided to all children in the morning until around 11:00 a.m.  (Alford Aff. ¶ 3; PALS Schedule (Attach. to Alford Aff.) (Doc. # 20-6).)  After 11:00 a.m., when many of the children with disabilities were dismissed  (PALS Rosters, at 1–5 (Attach. to Second Levey Aff.)), the program included "independent centers" conducted in the classroom, physical education, lunch, and nap time in the afternoon until 2:40 p.m.  (Alford Aff. ¶ 3; PALS

---

[1]Children of teachers in the school district could stay until 3:00 p.m. to allow the parents to finish their work days.  (PALS Description, at 1.)

Schedule (Attach. to Alford Aff.).)

### 3. S.B. Begins Attending PALS

Ms. B. placed S.B. in the PALS program through the special education referral process when he turned three and was entitled to a FAPE under the IDEA. S.B.'s IEP team met to develop his IEP on November 20, 2009. (S.B. 2009–2010 IEP 2 (Doc. # 24-13).) The IEP team included Ms. B.; Holly Levey, the coordinator of PALS; a special education teacher; a general education teacher; an occupational therapist; and a speech pathologist. (*Id.* at 10.) After this meeting, S.B. started attending the program in late November 2009. (*Id.* at 2.) His IEP team determined that he should attend the program three and a half hours per day, three days per week, for the remainder of the 2009–2010 school year. (*Id.* at 3.) S.B. attended the program according to his IEP, and Ms. B. paid for a private preschool program for S.B. during the time he was not at PALS. (Pl.'s Admin. Compl. 1 (Doc. # 24-24); Jennifer B. Decl. 7 (Doc. # 24-2).)

### 4. S.B. is Denied Full-time Attendance in PALS

In January 2010, a little over a month after S.B. entered PALS, Ms. B. started requesting that S.B. attend PALS full-time, because she believed S.B. would benefit socially, physically, and academically from more exposure to children and from the activities offered in the program throughout the day. (Jennifer B. Decl., at 4.) She repeatedly requested S.B.'s full-time placement in PALS from Holly Levey, the PALS coordinator, and Dr. Benita Cahalane, the special education director for the school district. (*Id.*) She repeatedly asserted that she wanted equitable educational opportunities for her son and that he would benefit

7

from the full-day exposure to children. (*Id.*)  Ms. B.'s requests for full-time placement were first denied on the basis that S.B. was progressing academically with the three-day per week, half-day participation that was set forth in his IEP. (*Id.*)  Later, Ms. B.'s request was refused on the basis that the full-time students pay tuition, to which she responded by offering to pay tuition for S.B. to attend full-time. (*Id.*)

On March 12, 2010, however, Dr. Cahalane told Ms. B. that her son would be able to attend the program full-time for the remainder of that school year and during the next school year. (*Id.*)  Ms. B. wrote Dr. Cahalane that same day, thanking her for her help with S.B.'s upcoming IEP team meeting and reiterating her belief that S.B.'s skills would benefit from his full-time attendance at PALS. (Jennifer B. Letter to Cahalane (Doc. # 24-14).)  However, on March 23, 2010, Dr. Cahalane wrote Ms. B. an e-mail informing her that S.B.'s participation would remain part-time, three days a week. (Cahalane e-mail to Jennifer B. (Doc. # 24-15).)  She told Ms. B. that she had met with Holly Levey and another member of S.B.'s IEP team, and together they had concluded that S.B. was progressing on the objectives in his IEP with part-time participation. (*Id.*)  Dr. Cahalane told Ms. B. that they would continue to monitor S.B.'s progress, and that if his rate of progress required a change to his IEP, an IEP meeting would be called to discuss changing his IEP. (*Id.*)

Before the end of the 2009–2010 school year, S.B.'s participation in PALS was increased to four times per week for approximately three and a half hours. (Jennifer B. Dep., at 65.)  During S.B.'s May 2010 IEP team meeting, at which Ms. B. was present, his IEP was amended to this effect. (*Id.*; S.B. 2010–2011 IEP 3, 15 (Doc. # 24-1).)  S.B. attended the

PALS program part-time, four days a week, throughout the 2010–2011 school year. Through a lottery, he obtained a full-time spot in another integrated preschool program operated by the Board for the 2011–2012 school year, but he still receives some special education services through PALS. (Jennifer B. Decl., at 7.)

## B.  Procedural Background

Ms. B. filed an administrative complaint against the Board with the Alabama Department of Education ("DOE") on June 6, 2011, in which she requested an impartial due process hearing under the IDEA.  (Pl.'s Admin. Compl. 1 (Doc. # 24-24).)  In her administrative complaint, Ms. B. claimed discrimination under Section 504 and Title II of the ADA, but she stated she was filing the complaint out of an "over-abundance of caution" to exhaust her remedies under the IDEA. (*Id.*)  She asserted that S.B. had never been able to participate in the program consistent with the participation offered to non-disabled children. (*Id.* at 2.)  She further alleged that the Board's discriminatory actions had forced her to fund another preschool program for her son and that he was denied educational opportunities.  (*Id.*)  At the end of the complaint she listed the various types of relief she sought: equitable relief, reimbursement for her out-of-pocket expenses, compensatory damages, and reasonable attorneys' fees.  (*Id.*)

The DOE assigned Hearing Officer P. Michael Cole to Ms. B.'s case.  (*See* Pl.'s Admin. Br. 1 (Doc. # 24-24).)   On July 11, 2011, upon Officer Cole's request, Ms. B. submitted a two-page letter brief which outlined the facts underlying her discrimination claims under Section 504 and the ADA (*Id.* at 1–3), in lieu of testimony at a due process

hearing.  (Def.'s Admin. Resp. 1 (Doc. # 8-3).)   Ms. B. informed Officer Cole that the purpose of her letter was to determine if the DOE had any jurisdiction over her claims.  (Pl.'s Admin. Br., at 1.)  In her brief, Ms. B. took the position that "irrespective of whether [S.B.] requires a full time placement at the preschool in order to secure a FAPE under IDEA, the District has excluded [S.B.] from such full time participation in the program due to his status as a child with a disability."  (*Id.* at 1.)  Ms. B. sought  rulings from Hearing Officer Cole that he lacked jurisdiction over her claims and that she had exhausted, or had attempted to exhaust, her administrative remedies under the IDEA.  (*Id.* at 1–2.)  She reiterated her claims that S.B. had been harmed by not being able to benefit from the same socialization and activities as the non-disabled children, and that she had been forced to provide alternative services for S.B.  (*Id.* at 2.)

Two weeks later, the Board responded to Ms. B.'s letter brief. (Def.'s Admin. Resp., at 1.)  The Board argued that by failing to allege a violation of the IDEA and taking the position that the DOE lacked jurisdiction over her claims, Ms. B.'s hearing request was a "nullity," and thus, she had failed to exhaust her remedies under the IDEA.  (*Id.*)  The Board further argued that if the hearing officer concluded he lacked jurisdiction, he would not have authority to rule that Ms. B. had exhausted her remedies under the IDEA.  (*Id.*)

After conducting a telephone conference with the parties on the jurisdictional issue, Hearing Officer Cole dismissed the case in a three-page order.  (Admin. Order 1–2 (Doc. # 24-24).)  Basing his ruling on the letter briefs, the telephone conference, and applicable state and federal laws, he found that Ms. B.'s requests for relief "did not pertain to issues under

the IDEA." (*Id.* at 2.)  He ruled that he lacked jurisdiction to rule on her Section 504 and ADA claims and that Ms. B. had exhausted the required procedures under the IDEA.  (*Id.*) Neither party immediately appealed this decision in federal or state court, and Ms. B. filed the present suit on October 6, 2011.

## V. DISCUSSION

The Board asks the Court to dismiss all the claims asserted against it because Ms. B. failed to exhaust her Section 504 and ADA claims to the extent required by the IDEA in 20 U.S.C. § 1415(*l*).  Ms. B. explicitly disputes that she has failed to exhaust under the IDEA's procedures.  The Court first concludes that Ms. B. was required to exhaust her Section 504 and ADA claims under the administrative procedures in the IDEA.  Furthermore, although Ms. B. followed the administrative procedures set forth in the IDEA, the Court concludes that Ms. B.'s claims were not adequately exhausted because the state hearing officer erroneously dismissed her case before adequate development of the factual record.

## A.    <u>Applicable Statutes</u>

The IDEA, Section 504, and the ADA, which are linked to each other by the IDEA's exhaustion  requirement, apply in the context of public special education and are at issue in this case.  A general overview of the relevant provisions of each is set forth below.

### 1.    *The IDEA*

The IDEA, formerly named the Education for All Handicapped Act ("EHA"), provides state and local education agencies with funding to "ensure that all children with disabilities have available to them a free and appropriate public education ["FAPE"] that

emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).   Under the IDEA, all state or local special education agencies receiving federal funding for their special education programs are required to identify children with disabilities and develop individualized education programs ("IEPs") that meet the unique education needs of each child.  *Id.* § 1412(a)(4).  The IEP is the centerpiece of the IDEA—it is a comprehensive written statement that outlines the child's annual goals and the education and related services needed to achieve those goals.  *Id.* § 1414(d).  IEPs are developed by a team of the child's parents, teachers, and school administrators.  *Id.* § 1414(d).  Another important feature of the IDEA is its "mainstreaming" requirement; participating states must educate disabled children in an integrated environment with non-disabled children.  *Id.* § 1412.  This so-called "least restrictive environment" provision states:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

In addition to providing detailed procedures for the development and periodic review of the IEPs, the IDEA requires that state and local agencies receiving federal funds make procedures available to parents to ensure that parents of children with disabilities are able to assert their rights to a FAPE.  *Id.* § 1415(a).  First, parents may file a complaint "with respect

to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6). Following the complaint, parents may request an impartial due process hearing conducted by the state or local education agency as determined by state law, or with the state educational agency if state law does not specify. *Id.* § 1415(f). The Eleventh Circuit has explained that "[t]he philosophy of the IDEA is that plaintiffs are required to utilize the elaborate administrative scheme established by the IDEA before resorting to the courts to challenge the actions of the local school authorities." *N.B. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996).

### 2.     *Section 504 of the Rehabilitation Act*

In addition to the IDEA, two other federal statutes protect persons with disabilities in the special education context—Section 504 of the Rehabilitation Act and Title II of the ADA. These are the statutes under which Ms. B. asserts her discrimination claims.

Section 504 of the Rehabilitation Act provides:

No otherwise qualified individual with a disability in the United States . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental

Disabilities Act of 1978.

29 U.S.C. § 794(a).  Unlike the statutory text of the IDEA, which mandates affirmative action by participating states to provide disabled children a free and appropriate education under a detailed procedural framework, Section 504 simply prohibits discrimination against disabled persons.  *Sellers by Sellers v. Sch. Bd. of Mannassas, Va.*, 141 F.3d 524, 528 (4th Cir. 1998).  Thus, in the special education context, a school district may not exclude, deny benefits to, or discriminate against any student solely on the basis of his or her disability. *Ms. H. v. Montgomery Cnty. Bd. of Educ.*, 784 F. Supp. 2d 1247, 1259 (M.D. Ala. 2011).

### 3.    *Title II of the ADA*

Title II of the ADA, which applies to public entities,[2] contains an anti-discrimination provision that is almost identical to Section 504.  That provision states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Thus, discrimination cases under Section 504 have precedential value for cases arising under the ADA, and vice-

---

[2] "Public entity" is defined to include "(A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1)(A) & (B).

versa.  *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000).

The Eleventh Circuit has held that this provision applies in the context of public employment. *Bledsoe v. Palm Beach Cnty. Soil and Water Conserv. Dist.,* 133 F.3d 816, 820 (11th Cir. 1998).  In Title II public employment discrimination, the standards applicable to Title I private employment claims apply.  28 C.F.R. 35.140(b)(1).

**B.    Exhaustion Under the IDEA**

The IDEA does not limit a plaintiff's ability to seek relief "available under the Constitution, [the ADA, Section 504], or other Federal laws protecting the rights of children with disabilities."  20 U.S.C. § 1415(*l*).  Nevertheless, the IDEA requires parties to exhaust any claims asserted under those statutes under its procedural framework before resorting to the courts.  *Id.*  The IDEA states in relevant part:

> . . . before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*).[3]   The Tenth Circuit has clarified that "available" relief means "relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers, or specifically seeks." *Padilla ex rel. Padilla v. Sch. Dist. No. 1 in City & Cnty. of Denver, Colo.*, 233 F.3d 1268, 1274 (10th Cir. 2000) (internal

---

[3]Subsections (f) and (g) of § 1415 describe the due process hearing and the right of appeal to the state education agency when the hearing is conducted by the local educational agency pursuant to state law.  Only exhaustion under subsection (f) is relevant to this case, because due process hearings are conducted by the state education agency, according to Alabama law.  Ala. Admin. Code 290-8-9.08(9).

citation omitted).  Reimbursement to parents for their unilateral alternative private placement of a child whose IEP is later found to be inadequate is relief available under the IDEA, even if the alternative placement would not meet the state's educational standards.  *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 14 (1993).

It is well established in the Eleventh Circuit that a plaintiff may not circumvent the procedures provided by the IDEA merely by raising claims under another statute or seeking relief in federal court that the administrative agencies cannot grant.  The Eleventh Circuit has held that "claims asserted under Section 504 and/or the ADA are subject to Section 1415(f)'s requirement that litigants exhaust the IDEA's administrative remedies *to obtain relief that is available under the IDEA* before bringing suit under Section 504 and/or the ADA." *M.T.V. v. DeKalb Cnty. Sch. Dist.*, 446 F.3d 1153, 1159 (11th Cir. 2006) (emphasis added) (holding parents' retaliation claims under Section 504 and the ADA subject to the IDEA exhaustion requirement); *Babicz v. Sch. Bd. of Broward Cnty.*, 135 F.3d 1420, 1422 n.10 (11th Cir. 1998) (affirming district court's dismissal of plaintiffs' ADA and Section 504 claims for failure to exhaust the IDEA's administrative remedies).  Moreover, the Eleventh Circuit has rejected attempts by plaintiffs to avoid the IDEA's exhaustion requirement by asking federal courts for a type of relief that is beyond the state agency's authority to grant, such as compensatory damages.  *N.B.*, 84 F.3d at 1379.

The Eleventh Circuit has stated that the rule of exhaustion "serves a number of important purposes, including (1) permitting the exercise of agency discretion and expertise

on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error." *Ass'n for Retarded Citizens of Ala., Inc. v. Teague*, 830 F.2d 158, 160 (11th Cir. 1987).

Courts are not to apply the rule of exhaustion inflexibly, *N.B.*, 84 F.3d at 1379, but rather use their discretion to further the rule's purposes. *Ezratty v. Puerto Rico*, 648 F.2d 770, 774 (1st Cir. 1981). To this end, the Eleventh Circuit has recognized two situations in which exhaustion is not required: (1) where resorting to administrative remedies would be futile and (2) where the available relief would be inadequate. *N.B.*, 84 F.3d at 1379; *M.T.V.*, 446 F.3d at 1159. The party seeking exemption from the exhaustion requirement bears the burden of demonstrating futility or inadequacy of relief. *M.T.V.*, 446 F.3d at 1159.

## C.     <u>The IDEA's Exhaustion Requirement as Applied to the Parties' Dispute</u>

The Board argues that because Ms. B. failed to exhaust her administrative remedies on her claims under § 504 of the Rehabilitation Act and Title II of the ADA through the procedural framework contained in the IDEA, this suit is premature. Ms. B. asserts she was not required to exhaust her remedies under IDEA's procedures, and that even if she was, she has satisfied the exhaustion requirement by filing a complaint under the IDEA and requesting a due process hearing with the Alabama Department of Education ("DOE"). The Court concludes that Ms. B. was required to exhaust her claims according to the IDEA's

17

procedures.  Furthermore, the Court concludes that Ms. B. has not exhausted the IDEA-related claims in this action, because the hearing officer erred in ruling that because Ms. B.'s claims did not pertain to the IDEA, he lacked jurisdiction over them.

### 1. Ms. B. Was Required to Exhaust Under the IDEA

The Court concludes, based on the Eleventh Circuit's explicit holdings in *M.T.V.* and *Babicz*, that Ms. B. was required to exhaust her Section 504 and ADA claims through the IDEA procedural framework.  Those cases held that plaintiffs asserting claims arising in the special education context under the ADA or Section 504 must first resort to the administrative remedies provided in the IDEA to exhaust their claims.  *M.T.V. v. DeKalb Cnty. Sch. Dist.*, 446 F.3d 1153, 1159 (11th Cir. 2006); *Babicz v. Sch. Bd. of Broward Cnty.*, 135 F.3d 1420, 1422 n.10 (11th Cir. 1998).

Ms. B. argues that her claim of discriminatory exclusion of S.B. from full-time participation in the PALS is something separate and apart from the provision of a FAPE under the IDEA. (Pl.'s Resp. 67.)  However, because S.B.'s equal participation in PALS and Ms. B.'s claim for reimbursement for the alternative services she obtained are issues for which the IDEA provides relief, *see Florence Cnty. Sch. Dist.*, 510 U.S. at 14,  Ms. B. was required to resort to the administrative remedies in the IDEA before filing suit.  Moreover, all of Ms. B.'s claims arise out of the Board's refusal to provide S.B. full-time participation in PALS, conduct for which the IDEA contemplates relief.

Ms. B. argues that seeking relief under the IDEA would have been illogical given the Board's representation to the Court that only daycare services were provided in the afternoon after S.B. left the program. (Pl.'s Resp., at 76; Def.'s Summ. Judg. Mot., at 2, 4.)  Ms. B. essentially argues that IDEA would have been futile, because the "daycare" services from which S.B. was excluded did not fall within the ambit of the IDEA.  Since futility is one of the recognized exceptions to the exhaustion requirement, this reason might excuse Ms. B. from exhausting her claims under the IDEA.  *See  N.B.*, 84 F.3d at 1379; *M.T.V. v. DeKalb Cnty. Sch. Dist.*, 446 F.3d 1153, 1159 (11th Cir. 2006).

This Court disagrees that seeking relief pursuant to the IDEA would be futile to provide reimbursement relief to Ms. B.  First, the record reveals that PALS provided physical education in the afternoon.  (Alford Aff., at 3–4.)  Even if no academics were provided in the afternoon, as the Board asserts, the Court sees no reason to exclude physical education from the definition of "educational services."   Moreover, the Board asserts that the afternoon activities fall within the scope of a FAPE under the IDEA as "related services." (Def.'s Summ. Judg. Mot., at 36).  Related services is a component of a FAPE which includes, among other things, "developmental services," including "recreation." 20 U.S.C. § 1401(26).  Because the record reveals that recreation and playtime occurred in the afternoon, along with lunch and extra time for socialization (Alford Aff., at 3–4), the Court concludes these services fall within the "related services" component of a FAPE under the IDEA.

### 2.  Ms. B.'s Claims Have Not Been Adequately Exhausted

The parties do not dispute that Ms. B. followed the procedures under the IDEA before filing this action in federal court.  Ms. B. filed an administrative complaint and a request for a due process hearing with the Alabama Department of Education claiming the Board violated Section 504 and Title II of the ADA.  She cited the IDEA when requesting the hearing, but she did not claim any IDEA-specific violations on the part of the Board and asserted only that her claims arose under Section 504 and the ADA.  Ms. B.'s complaint alleged that as a result of the Board's discriminatory actions, she was required to fund an alternative preschool program and that S.B. was denied educational opportunities.

The DOE assigned the case to Hearing Officer Cole, who requested a written statement of the facts and letter briefs from both parties.  In her two-page letter brief and facts statement, Ms. B. maintained that her claims arose under Section 504 and the ADA and requested rulings from the hearing officer that (1) he lacked jurisdiction over her claims and (2) she had exhausted, or attempted to exhaust, her administrative remedies.  The Board argued in response that Ms. B.'s due process request was a "nullity" because its sole purpose was to obtain a jurisdictional ruling, and thus, she had not exhausted her remedies under the IDEA.  The Board further argued that if the hearing officer found he lacked jurisdiction over Ms. B.'s claims, then he would not have the authority to conclude that she had exhausted her remedies.  At some point after the Board's response, Hearing Officer Cole conducted a teleconference with the parties on the issue of his jurisdiction.  He then issued a three-page order on August 16, 2011, in which he restated the facts of the case as Ms. B. presented them in her letter brief and ruled that he did not have jurisdiction over Ms. B.'s administrative

complaint on the ground that the issues did not relate the IDEA.  He also ruled that Ms. B.
had exhausted her administrative remedies under the IDEA.

The Eleventh Circuit has not yet addressed the issue of whether denial of a due
process hearing by a state agency waives the exhaustion requirement for plaintiffs bringing
IDEA-related claims.  However, a federal district court in another jurisdiction has faced a
similar atypical situation.  Although not binding on this Court, the disposition of that case
is nevertheless instructive.

In *Waterman v. Marquette-Alger Intermediate School District*, the district court was
faced with claims arising under the EHA,[4] Section 504, and § 1983 that had come "before
the court without any substantive review by state or local education authorities."  739 F.
Supp. 361, 366 (W.D. Mich. 1990).  In that case, the plaintiffs sought declaratory and
injunctive relief, compensatory damages, and attorneys' fees for alleged excessive discipline
of special education students.  *Id.* at 364.  Upon the school district's request, the state agency
dismissed the excessive discipline claims that the plaintiffs asserted under the EHA, finding
it had no jurisdiction over child abuse allegations.  *Id.* at 366.  Although it appeared to the
court that the "plaintiffs did attempt to *use* the administrative process to air their EHA
claims," the court remanded the case to the state agency, finding its jurisdictional ruling in
error.  *Id.*

_____

[4]The IDEA was formerly named the EHA.

As in *Waterman*, this case is "before the court without any substantive review by state or local education authorities." *Waterman*, 739 F. Supp. at 366. The Court finds that Ms. B. did not exhaust her remedies because Officer Cole erred when he dismissed her case for lack of jurisdiction. First, both Ms. B.'s administrative complaint to the DOE and her letter brief to Officer Cole reveal that she is seeking relief on a "matter that relat[es] to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child" under the broad complaint provision in the IDEA. 20 U.S.C. § 1415(b)(6). She alleged that S.B.'s attendance had never been consistent with what is offered to non-disabled students, that he had been refused full-time placement, and that his educational opportunities had been harmed (Pl.'s Admin. Compl., at 2.) She also alleges harms that could be redressed by the IDEA's remedies, such as the denial of educational opportunities and out-of-pocket costs for an alternative preschool program. (*Id.*) Thus, the Court finds that the IDEA-related issues in this case were apparent on the face of the complaint.

The plain language of the IDEA exhaustion requirement and the Eleventh Circuit precedent required that Officer Cole take jurisdiction over her case. Section 504 and ADA claims which seek relief available under the IDEA must be exhausted under the IDEA's remedies. *M.T.V.*, 446 F.3d at 1159; *Babicz*, 135 F.3d at 1422 n.10. Ms. B. alleged she had been forced to fund a private preschool program and specifically requested reimbursement for out-of-pocket expenses in her request for a due process hearing and her letter brief to Officer Cole. (Pl.'s Admin. Compl., at 2; Pl.'s Admin. Br., at 2.) As stated above,

reimbursement is a type of relief available under the IDEA. *Florence Cnty. Sch. Dist.*, 510 U.S. at 14. Because Ms. B.'s complaint sought at least one type of relief which was available under the IDEA, and because her complaint related to S.B.'s educational placement, the Court concludes Officer Cole had a duty to take jurisdiction over the case and explore and render rulings on any IDEA-related issues in the case, despite Ms. B.'s narrow request for a jurisdictional ruling. If an erroneous ruling on jurisdiction can be ignored, then an end-run around IDEA's exhaustion requirement will go unchecked.

Ms. B. argues that because the Board did not appeal the hearing officer's decision, the Board's argument should be deemed waived. (Pl.'s Resp., at 76 (Doc. # 34).) The IDEA gives parties who are "aggrieved" by a final administrative decision a right to appeal the ruling in federal and state court within ninety days of the decision, or as otherwise provided by state law. 20 U.S.C. § 1415(i)(2)(A)–(B). The Alabama Administrative Code provides that a party must appeal the final decision of a hearing officer by providing the opposing party a notice of intent to bring a civil action in federal court within thirty days, and by bringing suit within thirty days after giving notice. Ala. Admin. Code 290-8-9.08(9)(c).

However, the IDEA requires that a decision made by a hearing officer on a complaint "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education [FAPE]." 20 U.S.C. § 1415(f)(3)(E). The Court reads this provision as requiring a substantive decision on the school district's provision of a FAPE, even if, as in this case, the plaintiff avoids explicitly contesting the provision of a FAPE and merely seeks a dismissal of her case from the administrative

23

procedures. Because the decision of the hearing officer in this case was not made on substantive grounds, and because the Court finds the hearing officer erroneously dismissed issues that related to the educational placement of S.B., the Court finds the decision was not "final" under the IDEA. Thus, the Board's exhaustion argument is not waived by failing to bring a separate appeals claim on the jurisdictional ruling at the same time Ms. B. was bringing the present action in federal court. Moreover, the Board asserted Ms. B.'s failure to exhaust her administrative remedies as an affirmative defense in its Answer. (Def.'s Ans. ¶ 11 (Doc. # 8).) Therefore, the Court concludes that the Board did not waive its defense of exhaustion but merely raised it in this Court rather than raising it in a separate appeal under the IDEA and the Alabama Administrative Code.

## VI. CONCLUSION

The Court finds that remand to the state agency to explore the IDEA-related issues in this case serves the purposes of the exhaustion rule and effectuates Congress's intent in requiring an attempt at administrative resolution of matters relating to educational placement of children with disabilities. Remand will permit the state agency to exercise its discretion and expertise on the IDEA-related issues in this case that must first be resolved before this Court can address Ms. B.'s Section 504 and ADA claims. *Teague*, 830 F.2d at 160; *M.T.V.*, 446 F.3d at 1159; *Babicz*, 135 F.3d at 1422. Remand is also consistent with the Eleventh Circuit precedent that Section 504 claims and ADA claims arising in the special education context be exhausted *to obtain relief* that is available under the IDEA.

Accordingly, it is ORDERED that:

24

(1)    This cause of action is STAYED pending a final decision on the IDEA-related claims and issues.

(2)    Defendant's Motion for Summary Judgment (Doc. # 20) and Plaintiff's Motion for Partial Summary Judgment (Doc. # 22) are DENIED with leave to refile after Plaintiff's administrative remedies have been exhausted.

(3)    Both parties are ORDERED to file a joint monthly status report with the Court until the administrative proceedings are completed.  The reports shall be received by the **fifth day of each month beginning November 5, 2012**, until further ordered by the Court.

DONE this the 19th day of September, 2012.

_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE